## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANTON STINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 21- CV- 3347 |
| vs. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO POLICE | ) | |
| DEPARTMENT, A Municipal | ) | **Jury Demand** |
| Public Entity; JORIE HELSTERN- | ) | |
| WOOD, aka FOX, Star No. 9770; | ) | |
| MICHAEL MANCHA, Star No. | ) | |
| 19383; PATRICK SORAGHAN, Star | ) | |
| No. 12956; ADAM ALTENBACH, | ) | |
| Star No. 13832; VINCENT | ) | |
| HERMAN, Star No. 15923; | ) | |
| MICHELLE WILSON, Star No. 281; | ) | |
| Unknown Officers of the Chicago | ) | |
| Police Department; and the CITY OF | ) | |
| CHICAGO; | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, Anton Stinson, by and through his attorney, James M.

Falvey, Falvey Law Office, and complains against the following Defendants: Jorie

Helstern-Wood, aka Fox, Star No. 9770; Michael Mancha, Star No. 19383; Patrick

Soraghan, Star No. 12956; Adam Altenbach, Star No. 13832; Vincent Herman, Star

No. 15923; Michelle Wilson, Star No. 281; City of Chicago Police Department; Unknown Officers of the Chicago Police Department; and, the City of Chicago.

1.     This action arises under the United States Constitution and the laws of the United States, specifically 42 U.S.C. § 1983, to redress deprivations of the civil rights of the plaintiff, Anton Stinson, through acts and/or omissions of defendants, Jorie Helstern-Wood, Michael Mancha, Patrick Soraghan, Adam Altenbach, Vincent Herman, Michelle Wilson, City of Chicago Police Department, Unknown Officers of the Chicago Police Department, and the City of Chicago, committed under color of law. Specifically here, defendants deprived plaintiff of his rights under the Constitution of the United States. In addition, plaintiff asserts supplemental Illinois state claims.

## JURISDICTION AND VENUE

2.     Jurisdiction is based upon 28 U.S.C. §§ 1331, 1343, and 1367.

3.     Venue lies in the United States District Court, Northern District of Illinois, pursuant to 28 U.S.C. §1391, because all events or omissions giving rise to claims described in this Complaint occurred in this jurisdiction.

## PARTIES

4.     Plaintiff, Anton Stinson, is a 39-year-old black man, who is a United States citizen. He was, at all times relevant to the events described in this Complaint, a resident of the City of Chicago, County of Cook, State of Illinois in the United States of America.

5.      The Defendant City of Chicago ("City of Chicago" or "Chicago") is a municipal organization duly incorporated and existing under the laws of the State of Illinois.

6.      Defendant City of Chicago Police Department ("City of Chicago Police Department" or "CPD") was maintained, managed, and/or operated by the City of Chicago.

7.      At all times relevant to the events described in this Complaint, Defendant Jorie Helstern-Wood, referred to by her colleagues as "Fox," Star No. 9770, was employed by the City of Chicago Police Department as a police officer. On the day of the incident,[1] July 9, 2019, she was dressed in plainclothes. Upon information and belief, her casual dress was standard for her job on a "tactical team" ("Tac Team"). Defendant Helstern-Wood is sued in her official and individual capacities. She was acting under color of law at all times relevant hereto.

8.      At all times relevant to the events described in this Complaint, Defendant Michael Mancha, Star No. 19383, was employed by the City of Chicago Police Department as a police officer. On the day of the incident, July 9, 2019, he was dressed in plainclothes. Upon information and belief, his casual dress was

---

[1] The "day of the incident," July 9, 2019, refers to the day in which Plaintiff Anton Stinson was falsely arrested for allegations of crimes that he did not commit. It is the day during which Mr. Stinson's U.S. Constitutional, Illinois Constitutional, and Illinois Statutory Rights were initially violated by defendants.

standard for his job on a Tac Team. Defendant Mancha is sued in his official and individual capacities. He was acting under color of law at all times relevant hereto.

9.      At all times relevant to the events described in this Complaint, Defendant Patrick Soraghan, Star No. 12956, was employed by the City of Chicago Police Department as a police officer. On the day of the incident, July 9, 2019, he was dressed in plainclothes. Upon information and belief, his casual dress was standard for his job on a Tac Team. Defendant Soraghan is sued in his official and individual capacities. He was acting under color of law at all times relevant hereto.

10.      At all times relevant to the events described in this Complaint, Defendant Vincent Herman, Star No. 15923, was employed by the City of Chicago Police Department as a police officer. On the day of the incident, July 9, 2019, he was dressed in plainclothes. Upon information and belief, his casual dress was standard for his job on a Tac Team. Defendant Herman is sued in his official and individual capacities. He was acting under color of law at all times relevant hereto.

11.      At all times relevant to the events described in this Complaint, Defendant Michelle Wilson, Star No. 281, was employed by the City of Chicago Police Department as a Lieutenant. Defendant Wilson was a Supervisor in the Chicago Police Department and signed off on the Arrest Report as to Mr. Stinson and approved probable cause on July 9, 2019. Defendant Wilson is sued in her official

and individual capacities. She was acting under color of law at all times relevant hereto.

12.     To the extent that there are other unnamed officers and/or supervisors of the City of Chicago Police Department that were involved in the events giving rise to Plaintiff's claims, Plaintiff will seek leave to amend his complaint upon learning the identity of the unknown Defendants, so as to properly allege their names. Additionally, if Plaintiff learns that certain activities attributed to named police officers were actually committed by unnamed and/or unknown police officers, Plaintiff will seek leave to amend his complaint to state the proper names of police officers with the activities alleged.

13.     The Defendant City of Chicago is the employer and principal of Defendants, Officer Jorie Helstern-Wood, Officer Michael Mancha, Officer Patrick Soraghan, Officer Adam Altenbach, Officer Vincent Herman, Lieutenant Michelle Wilson, City of Chicago Police Department, and Unknown Officers of the Chicago Police, all of whom were acting under color of law and within the scope of his or her employment at all times relevant to this lawsuit. To reiterate, the Defendants Helstern-Wood, Mancha, Soraghan, Altenbach, Herman, Wilson, and any Unknown Officers of the Chicago Police (collectively, the "Individual Defendants") are being sued in their individual/personal capacities.

14.     The Defendant City of Chicago is the employer of Defendants Officer Jorie Helstern-Wood, Officer Michael Mancha, Officer Patrick Soraghan, Officer Adam Altenbach, Officer Vincent Herman, Lieutenant Michelle Wilson, and any Unknown Officers of the Chicago Police, is being sued herein on a theory of respondeat superior with regard to the Illinois common law claims. Further, it is a necessary party to this action and is a body politic and corporate because the City of Chicago has a responsibility to indemnify the Individual Defendants' liability for official-capacity judgments, whether settled or litigated, as stated in *Carver v. Sheriff of LaSalle County*, 324 F.3d 947 (7th Cir. 2005).

## FACTS

### A nice day turns ugly

15.     On July 9, 2019, in the mid-morning, several members of the Chicago Police Department descended upon the neighborhood at 107 W. 112th Street in Chicago, Illinois (the "House").

16.     There was an anonymous and vague call to the police which indicated that some individuals were drinking alcohol and hanging out on 112th Street. The call also indicated that there were multiple individuals, including one or more individuals who were wearing a black tee-shirt and gray sweat pants, hanging out near or in a black Honda (it was actually brown).

6

17.     The police bodycam videos showed that there were several people who fit the description of the person identified by the caller – wearing some combination of a tee-shirt and sweat pants, typically of a gray, white, and black combination.

18.     In response to the call, the first two police officers arrived sometime between 10:30 am to 11:00 am.

19.     One of the officers is unknown to the Plaintiff and the other was Christopher Green, Star No. 13996. They were in a marked police car and wearing police uniforms. Officer Green and his partner pulled up behind the brown Honda. Officer Green and his partner got out of their car and approached the men in the Honda. The men in the car and Officer Green began a casual conversation about sports and other related items.

20.     Officer Green also stated something like: "somebody around here don't like you guys."

21.     Upon information and belief, Officer Green was referring to the fact that a female resident on the street, who was/is a senior citizen, frequently called the police on the men in the car, as well as Mr. Stinson, for any reason or no reason at all.

**Mr. Stinson's whereabouts**

22.     When Officer Green pulled up behind the brown Honda, Mr. Stinson, who was not too far from the front of the car, raised his hands above his head and walked away from the car toward the House at 147 W. 112th Street, Chicago, Illinois.

23.     Seeing police in the neighborhood was not a unique thing. They were often there. Upon information and belief, the neighborhood had/has a high crime rate relative to other areas in the City of Chicago.

24.     The police frequently hassled the residents in this neighborhood. Thus, to avoid the hassle, Mr. Stinson raised his hands to show the police that he was not a threat. He did have a beer with him and didn't want to get hassled about that. He walked away from the brown Honda and into the yard of 107 W. 112th Street. The house had a gate around it. So, Mr. Stinson went through the gate to this house and then he walked along the side of the house and into the backyard.

25.     The Arrest report, the Incident report, and Grand Jury testimony by the police all state that Mr. Stinson "walked at a fast pace" and held onto "his waistband area."

26.     These statements, in Paragraph 25, are incorrect. The bodycam videos show that Mr. Stinson did not walk away at a "fast pace," nor did he hold his waistband area. He walked at a normal pace with his hands in the air.

### The Tack Team Trio – Altenbach, Soraghan, and Helstern-Wood make their move

27.    In the meantime, Officers Altenbach, Soraghan, and Helstern-Wood, who had been parked down the street in an unmarked car, pulled up to the House. Officers Helstern-Wood, and Soraghan got out of the car, went through a gate, and went quickly into the backyard of the house without any probable cause (or a warrant).

28.    When Officer Helstern-Wood entered onto the privately owned property without permission, she had to go through a gate that made a loud noise when it closed. As she went on the private property, she pulled her weapon out of its holster and had it pointed in the direction of the backyard.

29.    When Mr. Stinson heard the gate make a noise, he quickly looked around the corner of the house to see what or who made the noise.

30.    Mr. Stinson saw someone in street clothes that had a gun pointed at him.

31.    At this point, Mr. Stinson is only aware of 2 officers being in the neighborhood. He had only seen 2 officers (Green and the unknown officer) who arrived in the blue and white car and were in uniform.

32.    As stated above, this neighborhood is known as a "high crime area" because it has a history of many crimes occurring relative to other neighborhoods. Several crimes involved shooting. Having grown up in this neighborhood, Mr.

Stinson's natural reaction upon seeing a gun pointed at him – and he does not know that it is a police officer when he sees the gun – is to run. Run as fast as he can away from the person who had pointed a gun at him (Officer Helstern-Wood). Mr. Stinson jumped over a tall iron fence from the backyard of the House into the next-door neighbor's yard. He ran through the alley and turned to run toward the police officers who had gathered on 112th Street. At this point, there were somewhere between 15-20 police officers congregating in the area.

33.    Mr. Stinson walked up to Officer Altenbach who violently grabbed Mr. Stinson around his throat. Officer Altenbach threw Mr. Stinson against a fence with his hand still around Mr. Stinson's throat.

34.    A number of officers quickly closed ranks around Mr. Stinson. Officers Herman and Mancha actively participated in what became a "beat down" of Mr. Stinson. He was slammed to the ground; punched in the face at least two times by Officer Herman, one time with a closed fist; received the now-notorious "knee to the neck" maneuver that killed George Floyd in Minnesota, which precluded Mr. Stinson from being able to breathe; and was eventually handcuffed and arrested. Mr. Stinson tried to comply with orders of the police. There were a number of unknown officers involved in the beat down of Mr. Stinson.

35.    After Mr. Stinson was arrested, Officer Helstern-Wood returned to the backyard of the House from which Mr. Stinson left. She went into the backyard

alone. Upon entering the backyard, Officer Helstern-Wood walked directly to a mini-barbeque grill that was located behind a large air conditioning unit at the House. She lifted the lid on the barbeque and found a Highpoint brand handgun.

36.     After his arrest, Mr. Stinson was taken to the District 5 police station. However, he was in severe pain and complained about various injuries he suffered in the beat down. Two unknown police officers drove him to Roseland Hospital. The medical records from Roseland Hospital state that Mr. Stinson suffered from: (i) pain in left wrist, (ii) a contusion of unspecified part of his head, (iii) sprain of left shoulder joint; and, (iv) sprain of left wrist. His pain was described as: acute, aching, and sharp. Mr. Stinson was prescribed: Ibuprofen (800 mg Tablet), Neosporin, and a pain relief ointment.[2]

**The Aftermath**

37.     On July 31, 2019, the Chicago Police Dept lab tested the High Point handgun for fingerprints and determined that Mr. Stinson's prints were not on the gun. Additionally, while DNA was taken from Mr. Stinson, it is unclear if any DNA tests were conducted on the firearm. Either way, there is no DNA tying Mr. Stinson to the gun.

---

[2] Plaintiff notes that it appears that his medical records from the Roseland Hospital have been improperly altered without the permission or knowledge of Mr. Stinson. This issue is being reviewed by Plaintiff to determine who, and why, the HIPAA-protected records were altered.

38.     Aside from the statements that Mr. Stinson held the front of his waistband and "speedily walked" into the backyard at the House, discussed above in Paragraphs 25-26, there are additional untrue statements made in the various police reports/testimony (including the Incident Report, the Arrest Report, the Grand Jury testimony by Officer Altenbach, etc.). These statements are verifiably false as per the bodycam video of several officers which contradicts the statements made in the various police reports and the Grand Jury testimony.

39.     For example, all of the police reports and Grand Jury testimony state that Mr. Stinson was crouched down by (or at) the barbeque grill when Officers Helstern-Wood and Soraghan entered the backyard of the House.

40.     That statement – which was made by Officer Altenbach before the Grand Jury on July 26, 2019 – is untrue. By the time Officer Helstern-Wood got to the backyard to see where Mr. Stinson was, he had already jumped over the large iron fence and into the neighbor's yard. The video demonstrates that it was impossible for Officer Helstern-Wood, Officer Soraghan, or any other police officer to have seen Mr. Stinson crouched down by the grill.

41.     Mr. Stinson never possessed this weapon. He never touched the weapon as his fingerprints and DNA were not found by the Police Lab to be on the weapon. He did not walk at a fast pace into the backyard of the House. He did not

hold his waistband area. He did not crouch down behind the barbeque grill or even look in its direction.

42.     Nonetheless, Mr. Stinson was charged with Unlawful Use of a Weapon by a Felon and Aggravated Unlawful Use of a Weapon under 720 ILCS 5/24-1.1(A).

### **Can we ever get a trial in Cook County?**

43.     Mr. Stinson was incarcerated from July 9, 2019 through May 26, 2020, when the bond he posted on May 22, 2020, was accepted and he was released. On January 6, 2021, Mr. Stinson's bond was modified such that he was unable to afford it ($100,000.00 cash bond) and he was taken back into custody where he remained until December 21, 2021, when he was found not guilty on his second day of a bench trial (the first day was December 7, 2021).

44.     Except for the 7 months that Mr. Stinson was out on bond with the condition of Electronic Monitoring ("EM"), Mr. Stinson was incarcerated from July 9, 2019 to December 21, 2021, which is almost 30 months. When the 7 months on EM are subtracted from the incarceration time, Mr. Stinson was in jail for approximately 23 months – nearly 2 full years. While Covid undoubtedly slowed courts down nationally, many jurisdictions around the country found ways to continue having criminal trials.

45.    Mr. Stinson was not the reason for the significant delay in getting to trial. Mr. Stinson and his trial counsel at the time announced that they were "ready for trial" on at least two occasions in 2021: June 16, 2021, and August 23, 2021 (it's possible that they announced that they were ready for trial as many as 4 times during 2021.

46.    As noted above, Mr. Stinson finally had his trial – a bench trial – beginning on December 7, 2021. After 2 half-days of proceedings, the Circuit Court Judge found Mr. Stinson "NOT GUILTY" on December 21, 2021.

### Plaintiff's Injury

47.    As a result of Defendants misconduct, Plaintiff suffered severe physical injury, pain, and emotional distress. Plaintiff was the victim of a "beat down" by the Chicago Police. He had a gun pointed at him. Plaintiff still has nightmares about being beaten up and incarcerated.

48.    Defendants' misconduct further caused Plaintiff to be incarcerated for nearly two years at the Cook County jail while he faced a possible fourteen-year sentence for a crime that Defendants knew he did not commit. During his wrongful incarceration, Plaintiff was denied the ability to engage in the various pleasures of human experience, from the simplest to the most important. While Plaintiff was incarcerated based on false reports and Grand Jury testimony, his fiancé had a miscarriage due to the stress associated with Mr. Stinson's arrest and incarceration.

## COUNT I

## 42 U.S.C. § 1983 – Excessive Force

## Fourth Amendment

49.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

50.     In the manner described more fully above, Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable force when they beat him up during his wrongful arrest.

51.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

52. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department.

## COUNT II

## 42 U.S.C. § 1983 – Unlawful Pretrial Detention, Speedy Trial and False Arrest

## Fourth, Sixth and Fourteenth Amendments

53.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

54. In the manner described more fully above, Defendants manufactured false reports, including the Incident Report, the Arrest Report, and false Grand Jury testimony implicating Plaintiff, despite the fact that the bodycam videos contradicted the falsified reports.

55. Additionally, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

56. Due to these actions by the Defendants, Plaintiff was denied his right to a Speedy Trial, as described more fully, above.

57. In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, causing injury to Plaintiff.

58. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

59.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

60.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department.

## COUNT III

## Illinois Law – Battery

61.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

62.     In the manner described above, Defendants, acting under color of law within the scope of their employment, engaged in offensive physical contact made without the consent of Plaintiff when Defendants subjected Plaintiff to a "beat down" during his unlawful arrest.

63.     These actions were undertaken intentionally, willfully and wantonly, or recklessly.

64.     The misconduct described in this Count was objectively unreasonable and was undertaken with intentional disregard of Plaintiff's rights.

65.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IV

## Illinois Law – Malicious Prosecution

66.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

67.     In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

68.     In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously causing injury.

69.     The judicial proceedings ended in Plaintiff's favor and in a manner indicative of his innocence when he was acquitted on December 21, 2021, following a criminal trial.

70.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

71.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT V

## Illinois Law – Intentional Infliction of Emotional Distress

72.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

73.     The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

74.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI

### Illinois Law – Willful and Wanton Conduct

75.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

76.     At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the recovery of the gun that was used to charge Plaintiff with Unlawful Use of a Weapon by a Felon and Aggravated Unlawful Use of a Weapon.

77.     Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

78.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII

### Illinois Law – Civil Conspiracy

79.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

80.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. The Defendants also reached an agreement among themselves to provide false justification for the unlawful arrest of Plaintiff. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

81.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

82.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

83.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

84.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII

## <u>Illinois Law – Respondeat Superior</u>

85.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

86.     While committing the misconduct alleged in the preceding paragraphs, the Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

87. Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT IX

## <u>Illinois Law – Indemnification</u>

88.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

89.      Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

90.     The Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

91.     The City of Chicago is responsible to pay any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant City of

Chicago, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Anton Stinson respectfully requests that this Court enter judgment in his favor against Defendants, awarding compensatory damages, punitive damages, attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff Anton Stinson demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.

DATED: April 21, 2022                    Respectfully submitted,

/s/ James M. Falvey

James M. Falvey
Falvey Law Office
200 S. Wacker Drive, Suite 3100
Chicago, Illinois 60606
(312) 404-5839
jimfalvey@yahoo.com

Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he served a copy of the foregoing document on all parties registered with this Court's CM/ECF system on April 21, 2022

/s/ James M. Falvey
James M. Falvey